UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

John Mitchell Brown, Sr.,

        Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 11-2337 ADM/FLN

FBI Fugitive Task Force Officers
Donald L. Ennenga, Kenneth J.
Grosinger, Daniel Otterson, and
Minneapolis Police Officer Michael Hentges,
each in their individual capacity,

        Defendants.

___

Stephen L. Smith, Esq., Law Firm of Stephen L. Smith, PLLC, Minneapolis, MN, on behalf of Plaintiff.

Lonnie F. Bryan, Esq., United States Attorney's Office, Minneapolis, MN, on behalf of Defendants.

___

## I. INTRODUCTION

On September 6, 2013, the undersigned United States District Judge heard oral argument on Defendants FBI Fugitive Task Force Officers Donald L. Ennenga, Kenneth J. Grosinger, Daniel Otterson, and Minneapolis Police Officer Michael Hentges' ("Defendants" or the "Task Force") Motion for Summary Judgment [Docket No. 45].[1] Plaintiff John Mitchell Brown, Sr. ("Brown"), opposes the motion. For the reasons set forth below, the motion for summary judgment is granted.

___

[1] The parties stipulated to, and the Court subsequently ordered, the dismissal with prejudice of Defendant the City of Minneapolis. See Order, Sept. 10, 2013 [Docket No. 59].

## II. BACKGROUND

Defendants are all members of the Minnesota Violent Crime Fugitive Task Force, a group of federal and state law enforcement officers, which tracks, locates, and arrests persons with outstanding arrest warrants for violent felonies. Defs.' Mem. Supp. Summ. J. [Docket No. 46] Ex. 3 ("Defs.' Exs.") 11.[2] On or about July 14, 2008, the Hennepin County Sheriff forwarded the arrest warrant for Curtis Ladon Walker ("Walker") to the Task Force, and requested assistance in locating and arresting Walker. See Defs.' Exs. at 22-28.

Defendant and FBI Special Agent Daniel T. Otterson led the investigation. Otterson obtained the address for Walker's mother, Felicia Beasley, and conducted an interview of her. Felicia Beasley fully cooperated with the investigation, and stated Walker had been living with his father, Donald Beasley. Id. at 29. Donald Beasley had been recently evicted, and both he and Walker went to live at another apartment complex, located at 15th Street and Portland Avenue in Minneapolis. According to Felicia Beasley, Walker and Donald Beasley lived between two different units in this complex. One unit belonged to Curtis Walker's brother Alex Walker, and Alex Walker's girlfriend, Joy Abkins. The other unit belonged to Plaintiff Brown. Id.; see also Smith Aff. [Docket No. 55] Ex. 2 ("Otterson Dep.") 17.

The Task Force obtained the address for Alex Walker, confirmed he lived with Joy Abkins, and confirmed the two lived in the building Felicia Beasley identified. Otterson Dep. 15. On August 12, 2008, Defendants went to this apartment complex looking to arrest Walker. Accompanied by the building caretaker, Defendants entered Alex Walker's apartment and found

---

[2] For ease of reference, page citations to Defendants' Exhibits shall be to the pages numbered by the CM/ECF system.

the unit vacant. Otterson Dep. 15, 19-20. Defendants then spoke with a neighbor who confirmed seeing Curtis Walker as recently as 36 or 48 hours prior to the agents' arrival. Smith Aff. Ex. 4 ("Hentges Dep.") 29; Otterson Dep. 15.

Next, Defendants returned to the building caretaker's office, where Otterson spoke by phone with apartment manager Karen Sorvaag. See Otterson Dep. 16. Otterson testified in his deposition that Sorvaag recognized Brown's name, and told the Task Force officers Brown had spent time in the same homeless shelter as Donald Beasley. Otterson Dep. 16. According to Otterson, Sorvaag also stated numerous people came and went from Brown's apartment, and that Sorvaag suspected drug activity. Id.

According to a more recent declaration submitted in opposition to summary judgment, Sorvaag does not recall parts of this conversation as recounted by Otterson. Sorvaag confirms she had previously spoken with Brown "about having a lot of visitors." Smith Aff. Ex. 7 ("Sorvaag Decl.") ¶ 2. However, Sorvaag does not recall Brown as being involved in drug activity, and states that if he had been, he would not have been allowed to continue living in the building. Id. ¶¶ 3-4. In addition, Sorvaag does not recall Donald Beasley, and states (presumably after checking her records) that no authorized tenant by that name lived in the building. Id. ¶ 5.

After the phone conversation with Sorvaag, Defendants proceeded to Brown's apartment. Officer Hentges knocked three times and announced the presence of law enforcement, but received no response. The Task Force heard voices or activity in the apartment, and decided to enter. Hentges Dep. 35-36; Otterson Dep. 24. Just as Hentges was about to unlock the door with the caretaker's key, John Brown Jr., Brown's son, opened the door from inside. Hentges Dep.

36. Agents Otterson and Grosinger, and Officer Hentges, entered the apartment with their firearms drawn, and ordered Brown, Jr. to lie face down on the floor. Otterson Dep. 25. Agent Ennenga remained outside to secure the hallway. Smith Aff. Ex. 3 ("Ennenga Dep.") 31-32. The agents inside the apartment announced their presence and moved to secure the premises. See Smith Aff. Ex. 1 ("Brown Dep.") 66. They located Brown and his cousin Ernest Brown, and ordered them to lie face down with their hands behind their heads. Id. at 59-60, 67-68. Brown moved slowly in lying down and placing his hands behind his head, and told the agents that he had recently had neck surgery. Id. at 60-61; Otterson Dep. 30. Unknown to Defendants at the time, Brown had an extensive history of pain and injury in his back and shoulders. See Defs.' Exs. at 55-129.

After the agents searched the apartment and did not find Walker, they began speaking with Brown. Hentges Dep. 41. Otterson asked Brown when his surgery had taken place. Brown told Otterson it had occurred six months prior, and that he had continued taking oxycodone, a prescription pain medication, since that time. Otterson Dep. 31. Because several months had elapsed, Otterson testified he became less concerned about causing Brown injury. Otterson Dep. 31-32. According to Brown, Otterson told Brown he should have completed his recovery by this time. Brown Dep. 72.

Next, Hentges requested Brown's identification. Brown Dep. 74. Based on information on Brown's identification card, the Hennepin County police dispatcher reported there was a felony warrant from Virginia for the arrest of a "John Brown." Hentges Dep. 41-42. Although Brown told the agents that he had never been to Virginia, Defendants nevertheless placed Brown under arrest. Brown Dep. 76. Hentges placed Brown in handcuffs by "grabbing" each hand and

4

placing them behind Brown's back. See Brown Dep. 79; Otterson Dep. 33. Testimony is in conflict as to whether Hentges handcuffed Brown while he was still lying down, or after he stood up, but both Brown and Hentges testified Hentges placed Brown in handcuffs while standing. Compare Brown Dep. 70-77; Hentges Dep. 41-42 with Otterson Dep. 33; Grosinger Dep. 45.

Hentges escorted Brown to the police vehicle by holding his left hand in a "sort of rough" grip, but did not push or pull him. Brown Dep. 81; Hentges Dep. 44. While in the car, Hentges called the sheriff's department to verify the warrant, and learned Brown was not the "John Brown" described in the Virginia warrant. Hentges apologized to Brown and released him. Hentges Dep. 44-45. During the time he was handcuffed, Brown testified to experiencing "lots of pain." Brown Dep. 81.

Approximately three years later, Brown initiated this action. He alleges Defendants violated his Fourth Amendment rights by conducting an unreasonable search and seizure, and that in the process of his arrest, Defendants used excessive force.[3] Brown claims he suffered a partially torn rotator cuff muscle and had to undergo surgery as a result of Defendants' actions. In addition, Brown claims he experienced mental anguish and emotional distress, including suffering from Post Traumatic Stress Disorder (PTSD). See generally Am. Compl. [Docket No. 32].

### III. DISCUSSION

**A. Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

---

[3] Brown voluntarily dismissed his claim for false arrest and imprisonment, acknowledging it was untimely. Also, as noted, the parties have dismissed the City of Minneapolis from this action. As a result, Brown's claim for vicarious liability is moot.

5

be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134 (8th Cir. 1999). However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B. Qualified Immunity**

Public officials, including police officers, who "exercise some discretionary functions while carrying out their executive duties" are generally entitled to qualified immunity from 42 U.S.C. § 1983 and Bivens claims. Walden v. Carmack, 156 F.3d 861, 869 (8th Cir. 1998); Wilson v. Layne, 526 U.S. 603, 609 (1999) (holding qualified immunity analysis identical for § 1983 and Bivens claims); see generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Qualified immunity applies unless the official's conduct "violated clearly established statutory or constitutional rights of which a reasonable person would have known." Walden, 156 F.3d at 869. The court considers: "(1) whether the facts alleged or shown, construed most favorably to the plaintiffs, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time

of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." Small v. McCrystal, 708 F.3d 997, 1003 (8th Cir. 2013). The qualified immunity standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Finally, qualified immunity is "a question of law for the court, rather than the jury, to decide." Littrell v. Franklin, 388 F.3d 578, 584-85 (8th Cir. 2004).

    **1. Warrantless Search**

Brown argues Defendants violated the Fourth Amendment's protection against warrantless searches. Brown concedes that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 602-03 (1980). However, Brown argues Defendants had no reliable evidence which might have established a reasonable belief that: (1) Walker resided in Brown's apartment; and (2) Walker was inside Brown's apartment at the time Defendants entered. Reviewing the information available to Defendants, Brown argues Felicia Beasley's information was both unreliable and uncorroborated, and Sorvaag's recent declaration creates questions of fact precluding summary judgment.

Defendants respond on two fronts. First, Defendants argue the key issue is not whether information sufficient to justify a warrantless search actually existed. Instead, the issue is whether, under the qualified immunity standard, a reasonable officer would have concluded that the search was unlawful based on the information available to Defendants. Defendants argue a

7

reasonable officer could have found, as they did, that the facts presented established at least an arguably reasonable belief that Walker resided with Brown, and that Walker was home. Second, Defendants argue that even when setting aside the reasonable officer standard, the actual evidence justified the warrantless search in this case.[4] In particular, Defendants argue they corroborated several benign aspects of Felicia Beasley's statement; they also obtained supporting information from Alex Walker's neighbor and property manager Sorvaag.

Qualified immunity shields Defendants from potential Fourth Amendment violations in this case. The information available to Defendants was not so lacking that a reasonable officer in the same position would have concluded a search of Brown's apartment would be unlawful. See Small, 708 F.3d at 1003.

Of primary importance, Defendants corroborated much of the information Felicia Beasley provided. For instance, Beasley told Agent Otterson that Alex Walker and Brown both lived in a particular apartment complex, and the Task Force later verified both addresses. Although it appears Alex Walker and Joy Abkins had recently vacated their unit prior to the Task Force's arrival, this apartment was still listed as their current address, thus offering some corroboration. Otterson Dep. 19. A neighbor also identified Curtis Walker from a photograph and confirmed seeing Walker in the apartment building as recently as 36 hours prior, further

---

[4] Defendants conflate the "reasonable belief" standard from Payton with the more common "reasonable suspicion" standard discussed in Terry v. Ohio, 392 U.S. 1 (1968). Although it appears the Eighth Circuit Court of Appeals has found these two standards at least roughly interchangeable, the Court does not address the issue here. See Valdez v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999) (observing the majority of circuits have interpreted "reasonable belief" to require a lower threshold of knowledge focusing on reasonableness, while the Ninth Circuit Court of Appeals appears to require probable cause to establish a "reasonable belief" under Payton).

corroborating Felicia Beasley's statement. Otterson Decl. [Docket No. 47] ¶ 8. The failure to record the neighbor's identity or exact statement may weaken the statement's reliability, but the fact the statement was made is not in dispute. In addition, Defendants reasonably accorded higher credibility to Felicia Beasley's statement, because in their experience, mothers do not usually cooperate with police against their son's interests. See Otterson Dep. 14, 16-17.

Sorvaag's statements also add to the reasonable justification Defendants could conclude that Walker resided with Brown. Sorvaag's statements added a connection to potentially illegal drug activity, as she complained of "numerous people coming and going from [Brown's] apartment at all the times of the day and night." Otterson Dep. 16; see also Hentges Dep. 30-32. Otterson also recalls learning from Sorvaag that Brown and Donald Beasley, Walker's father, had spent time in the same homeless shelter, providing another connection between Brown and Walker. Otterson Dep. 16.

Sorvaag's recent declaration does not create genuine issues of material fact sufficient to prevent the application of qualified immunity. To demonstrate a genuine issue of fact, the nonmovant must submit "significantly probative" evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Confirming Otterson's testimony, Sorvaag recalls having "concerns about frequent traffic" coming through Brown's apartment. Sorvaag Decl. ¶¶ 2-3. As to whether this traffic might reflect drug activity, Sorvaag assumes—without recalling—that Brown was not involved in such activity. Id. ¶ 4. Similarly, Sorvaag does not deny connecting Donald Beasley to Brown, but instead states she does not recall having a resident by that name, and that no one named Donald Beasley was an "authorized tenant" at the time. Id. ¶ 5. These gaps in memory of a conversation three years earlier are not "significantly probative" of

9

Sorvaag's original conversation with the Task Force, and thus insufficient to create a genuine issue of fact which might preclude finding qualified immunity.

Finally, Defendants testified to hearing activity in Brown's apartment despite knocking and announcing themselves several times without anyone coming to answer the door. Hentges Dep. 35-36. When officers knocking at a potential arrestee's residence hear activity within, such noise may contribute to establishing a reasonable belief that the arrestee is inside. United States v. Lloyd, 396 F.3d 948, 952 (8th Cir. 2005). In this case, Otterson believed the noise within Brown's apartment coupled with the lack of response to law enforcement's announcements could have indicated Walker's efforts to hide or prepare for Defendants' entry. Otterson Decl. ¶ 13.

While the undisputed evidence above does not present a particularly strong basis for the warrantless search, the evidence is not so weak that a reasonable officer in Defendants' position would have concluded the search was unlawful. By verifying several aspects of Felicia Beasley's statement, confirming Walker had been seen in the building recently, and by connecting Brown to Donald Beasley, Defendants had a reasonable basis to believe Walker may have been staying in Brown's apartment. Due to Walker's recent sighting, and by hearing activity inside Brown's apartment, Defendants also had a basis for believing Walker was inside at the time of their search. Defendants' judgment was not a knowing violation of the law, nor so plainly incompetent as to fall outside of qualified immunity's protections. See Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) ("[T]he qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable . . . .").

## 2. Excessive Force

In addition to challenging the constitutionality of Defendants' search, Brown claims Defendants used excessive force in the course of the search and arrest. Brown does not argue Hentges used more force than a reasonable officer might use when conducting a typical arrest. Instead, Brown essentially argues that given his fragile physical condition, Hentges should have used less force than normal. As noted, Brown has an extensive history of injury and treatment in his shoulders and back, though this was unknown to Defendants. See Defs.' Exs. at 55-129. There is no dispute that at the time of his arrest, Brown told the agents he had undergone neck surgery six months prior, and he continued to take pain medication in connection with the surgery. See Otterson Dep. 30-33. In light of his condition, Brown argues, Hentges should have handcuffed Brown's arms in front of him, instead of behind his back. Because Hentges did not do so, Brown claims he suffered partial tearing in a shoulder tendon and an exacerbation of a preexisting spine injury. See Smith Aff., July 23, 2013 [Docket No. 55] Ex. 6, at 2. He further argues all Defendants should be subject to his excessive force claim because he suffered PTSD as a result of the arrest.

Defendants respond that Brown suffered de minimis injury, and even if the injury was more severe, Hentges used a reasonable amount of force to perform the arrest. Defendants extensively cite Brown's medical history, arguing Brown's shoulder injury was more likely the result of long term medical conditions, and did not result from the arrest. And even if the injury was more than de minimis, Defendants argue Hentges acted reasonably under the circumstances by using only the force necessary to conduct the arrest, and that Brown was handcuffed for a

11

very short period of time.[5] Brown did not request any accommodation, including asking to be handcuffed in a different manner. Even if he had made such a request, Defendants argue they were not required to acquiesce, as doing so could have compromised their safety. See Rodriguez v. Farrell, 294 F.3d 1276, 1278 (11th Cir. 2002) (holding an officer may discount requests to be handcuffed with arms in front, even if suspect claims preexisting injury, depending on circumstances). Lastly, Defendants argue there is no reliable evidence Brown suffered PTSD at all, let alone as a result of the arrest itself.

When an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 394 (1989). As such, force used in the course of an arrest must be reasonable. Id. at 395-96. The officer's use of force must be viewed in context, with "careful attention to the facts and circumstances" of the case at hand. Id. at 396. The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. If an officer's actions are objectively reasonable, qualified immunity will prevent liability. Id. at 397.

The Eighth Circuit Court of Appeals recently clarified how courts in this district evaluate the use of force during an arrest. See Chambers v. Pennycock, 641 F.3d 898, 905-08 (8th Cir. 2011). However, qualified immunity considers only what a reasonable officer would have understood about the law at the time of the arrest. In this case, Defendants would not have had the benefit of Chambers' analysis because Brown's arrest occurred in 2008. As such, the law

---

[5] Defendants cite the deposition of John Brown, Jr. when arguing Brown was handcuffed for about 15 minutes, but Defendants did not submit the relevant transcript. Neither side argues Brown was detained for a significant amount of time.

12

existing at the time of the arrest must apply. See, e.g., Bishop v. Glazier, 723 F.3d 957, 962 (8th Cir. 2013). Prior to Chambers, a "reasonable officer could have believed that as long as he did not cause more than de minimis injury to an arrestee, his actions would not run afoul of the Fourth Amendment." Chambers, 641 F.3d at 908.

In considering the reasonable use of force, courts have generally agreed an arresting officer must take into consideration the arrestee's preexisting injuries. Eason v. Anoka-Hennepin E. Metro Narcotics & Violent Crimes Task Force, No. 00-311, 2002 WL 1303023, at *5 (D. Minn. June 6, 2002). Some courts, including the Eighth Circuit Court of Appeals, appear to have required either actual knowledge or some objective manifestation of preexisting injury, as opposed to requiring an officer to rely on the arrestee's assertions alone. See Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998); Estate of Srabian ex rel. Srabian v. Cnty. of Fresno, No. 1:08-CV-00336, 2012 WL 6651122, at *3-4 (E.D. Cal. Dec. 20, 2012) (collecting cases). As a court in this district held, "[r]equiring that there be an objective manifestation of the injury helps to ensure that police officers are not overburdened by having to take into account unsubstantiated and potentially falsified preexisting injuries while performing their duties." Eason, 2002 WL 1303023, at *6 (Magnuson, J.). Thus, for example, where an arrestee is wearing a sling or where he displays obvious, physical difficulty in placing his hands behind his back, an excessive force claim may stand. See Guite, 147 F.3d at 750; Eason, 2002 WL 1303023, at *6-7.

The evidence of preexisting injury available to Defendants at the time of Brown's arrest was extremely limited. Brown wore no bandages and bore no visible injuries, and the parties have offered no evidence indicating Brown exhibited physical difficulty in placing his arms behind his back during the arrest. Although Brown complained of pain, he did not request any

13

kind of accommodation.[6] He also did not tell Defendants he had any preexisting injuries or conditions in his shoulders. The only objective evidence of Brown's preexisting conditions was his prescription for oxycodone, which Brown stated he took in connection with a six-month-old neck surgery. For his part, it appears Hentges used, at most, the standard amount of force necessary to conduct an arrest: an amount which would not have caused an average person to be injured. See Hentges Dep. 44. Brown does not argue Hentges placed him in any unusual positions, deliberately applied unusual force, pushed or pulled him, or otherwise took any action beyond those necessary for a routine arrest.

Qualified immunity protects Hentges against Brown's excessive force claim, because it was not clearly established at the time of Brown's arrest that using standard arrest procedures would constitute excessive force. Brown stated his surgery occurred several months prior, leading Defendants to conclude the possibility of neck injury was reduced. While an apparently long-term prescription for oxycodone may have indicated chronic pain, it did not necessarily serve as objective evidence of a special vulnerability to injury. In these circumstances, qualified immunity must apply. To hold otherwise would have required Defendants to perform an on-the-spot analysis of Brown's medical history—a history they did not have—and then correctly assess the possibility of injury from performing unforced actions. The qualified immunity standard expressly disallows this kind of attempt to retroactively impose knowledge on officers acting in the moment. Graham, 490 U.S. at 396.

Brown's attempt to expand his excessive force claim to apply to all Defendants due to his

---

[6] Hentges testified Brown never complained of pain during the course of the arrest, but this factual dispute is resolved in Brown's favor for the present motion's purposes. See Hentges Dep. 46.

claimed suffering of PTSD is also unsuccessful.  As an initial matter, it is not evident Brown's evidence supporting a PTSD diagnosis would be admissible at trial.  See Walker v. Wayne Cnty., Iowa, 850 F.2d 433, 434-35 (8th Cir. 1988) ("When ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial.").  Brown's only evidence of PTSD is a set of notes written by his counselor, Paul Johnson.  Johnson does not appear to be a licensed psychiatrist or psychologist, or a medical doctor of any kind.  More than that, Johnson's notes never actually indicate how he reached a diagnosis of PTSD, or how Defendants' conduct caused the disorder.  And in some of his entries, Johnson stops referring to Brown's condition as PTSD, instead referring to it as "Post Traumatic Brain Injured," a diagnosis which does not seem coherent, let alone have a basis in the facts at hand.  Smith Aff. Ex. 8, at 9.  Even if Brown were allowed to introduce this evidence at trial, no reasonable factfinder could conclude it establishes Brown suffered PTSD as the result of his arrest.  Brown has not demonstrated how any of Defendants' conduct caused his alleged PTSD, nor how Defendants' conduct was objectively unreasonable in light of the circumstances.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 45] is **GRANTED**; and
2. All claims in the Amended Complaint [Docket No. 32] are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                                      BY THE COURT:


                                          s/Ann D. Montgomery
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated: November 7, 2013.